J-A17037-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JAMIR WILLIAMS | |
| Appellant | No. 1005 EDA 2015 |

Appeal from the Judgment of Sentence March 20, 2015
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0002378-2012

BEFORE:  GANTMAN, P.J., LAZARUS, J., and PLATT, J.*

MEMORANDUM BY GANTMAN, P.J.:                **FILED OCTOBER 07, 2016**

Appellant, Jamir Williams, appeals from the judgment of sentence entered in the Delaware County Court of Common Pleas, following his jury trial convictions for one count each of first-degree murder, attempted murder, aggravated assault, and possession of an instrument of crime ("PIC").[1]  We affirm.

The relevant facts and procedural history of this appeal are as follows. On the night of October 29, 2010, and early morning of October 30, 2010, Appellant was involved in an altercation with Robert Adams and Emerson Price at Ess's Bar in Chester, Pennsylvania.  After Appellant left the bar on

_____

[1] 18 Pa.C.S.A. §§ 2502(a), 901(a), 2702(a)(1), and 907(a), respectively.

_____

*Retired Senior Judge assigned to the Superior Court.

October 30, 2010, Appellant's then-girlfriend, Sijourney Yokley, drove Appellant back to the vicinity of the bar. Appellant exited the car and approached Robert Adams and Emerson Price, who were outside near the bar. Appellant shot both Robert Adams and Emerson Price, fatally wounding Emerson Price. Allante Johnson witnessed both the earlier altercation and the shooting of Robert Adams and Emerson Price.

The Commonwealth charged Appellant with several offenses arising from the shooting, including first-degree murder, attempted murder, aggravated assault, and PIC. Allante Johnson testified at Appellant's preliminary hearing on April 13, 2012. Mr. Johnson stated he had witnessed the altercation among Appellant, Robert Adams, and Emerson Price at Ess's Bar late on October 29, 2010, and in the early morning of October 30, 2010. Mr. Johnson explained how shortly after, he saw a woman drive Appellant to the vicinity of Ess's Bar, where Appellant exited the car and walked toward Robert Adams and Emerson Price. Mr. Johnson testified he saw Appellant shoot Robert Adams and Emerson Price.

After the preliminary hearing, Mr. Johnson provided Appellant's trial counsel with a written statement that recanted Mr. Johnson's preliminary hearing testimony. The statement said Mr. Johnson did not see Appellant shoot Robert Adams and Emerson Price. Appellant proceeded to a jury trial on December 16, 2014. Although the Commonwealth issued Mr. Johnson a subpoena, Mr. Johnson failed to appear at trial to testify as a Commonwealth

witness. For an unrelated reason, Appellant's first trial ended in a mistrial on December 17, 2014.

Appellant proceeded to a second jury trial on February 10, 2015. At this trial, Mr. Johnson appeared and testified on behalf of the Commonwealth. Mr. Johnson explained the written recantation statement he had provided to Appellant's counsel was false. Mr. Johnson said he provided the statement and did not appear at Appellant's initial trial because he feared for his and his family's safety if he gave incriminating testimony against Appellant. Mr. Johnson testified he received several threats after the preliminary hearing. Mr. Johnson indicated his car was damaged and the words "die rat" were written on the back of his car. Mr. Johnson added his telephone lines were cut and his home was burglarized. He also said he received threats while in prison and in his neighborhood. In sum, Mr. Johnson reaffirmed that his prior testimony at Appellant's preliminary hearing was true and his subsequent written statement was false. (**See** N.T. Trial #2, 2/11/15, at 107-211.)

Sijourney Yokley also testified for the Commonwealth at Appellant's second trial. During her testimony, the prosecutor began to ask Ms. Yokley about the statement she had provided police in February 2012, regarding the shooting. Defense counsel suddenly objected to the anticipated impeachment of Ms. Yokley, arguing how her testimony might be perjury if it differed from her prior statement, and she could be incriminating herself.

After sending the jury out, the court instructed Ms. Yokley she might commit perjury through her testimony at trial, and she had the right to consult with counsel before continuing to testify. Ms. Yokley responded that she did not want to continue her testimony at that time and stepped off the stand. The court instructed the Commonwealth to issue Ms. Yokley a material witness warrant and placed Ms. Yokley under arrest until she had the opportunity to speak with counsel the next morning. Within fifteen minutes, Ms. Yokley returned to the stand to continue her testimony. Ms. Yokley stated that in the early morning of October 30, 2010, Appellant told her about the altercation at Ess's Bar. Ms. Yokley stated she drove Appellant to the vicinity of Ess's Bar, where Appellant asked Ms. Yokley to stop the car because he recognized at least one of the two males who were on the street. Ms. Yokley explained Appellant reentered the car after Ms. Yokley heard gunshots. Ms. Yokley also stated Appellant threatened her months later not to speak about the shooting. (*See* N.T. Trial #2, 2/10/15, at 315-46.)

Following a three-day trial, the jury found Appellant guilty of one count each of first-degree murder, attempted murder, aggravated assault, and PIC. The court sentenced Appellant on March 20, 2015, to life imprisonment for murder, a consecutive 140-280 months' incarceration for attempted murder, and a consecutive 30-60 months' incarceration for PIC (aggravated assault merged with attempted murder for sentencing). Appellant filed a timely notice of appeal on April 6, 2015. On April 14, 2015, the court

ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Rule 1925(b). After the court granted an extension, Appellant timely complied on June 17, 2015.

Appellant raises two issues for our review:

> COMMONWEALTH WITNESS ALLANTE JOHNSON TESTIFIED THAT HE WITNESSED [APPELLANT] SHOOT THE TWO VICTIMS. HE ALSO TESTIFIED THAT HE WROTE AND SIGNED A STATEMENT TO COUNSEL FOR [APPELLANT] ACKNOWLEDGING THAT HIS POLICE STATEMENT AND PRELIMINARY HEARING TESTIMONY WAS FALSE AND HE DID NOT WITNESS THE SHOOTING. THIS WITNESS TESTIFIED AT TRIAL THAT HE DID NOT RESPOND TO A COMMONWEALTH SUBPOENA TO APPEAR FOR TRIAL IN DECEMBER 2014 THAT ENDED IN A MISTRIAL BECAUSE HE WAS "SCARED." OVER OBJECTION FROM COUNSEL, THE COMMONWEALTH WAS PERMITTED TO EXAMINE THE WITNESS ABOUT HIS CAR BEING VANDALIZED AND THE WORDS "DIE RAT" WRITTEN ON HIS CAR. IN RESPONSE TO THE COMMONWEALTH'S QUESTION, "WERE THERE ANY OTHER INSTANCES?" THE WITNESS RESPONDED BY DESCRIBING "MY PHONE LINES GOT CUT AND A COUPLE OF WEEKS AGO SOMEBODY HAD [COME] IN THE CRIB…." THE COMMONWEALTH PRE-EMPTIVELY STOPPED THE WITNESS FROM FURTHER TESTIMONY. THE LEARNED TRIAL COURT ERRED WHEN IT PERMITTED THE WITNESS TO DESCRIBE INCIDENTS THAT HE FELT WERE DESIGNED TO INTIMIDATE HIM AS A WITNESS AS THERE WAS NO SHOWING THAT THE CONDUCT WAS CONNECTED DIRECTLY OR INDIRECTLY TO [APPELLANT]. HE WAS INCARCERATED WHEN ALL OF THE EVENTS OCCURRED. THE ERROR IS AMPLIFIED WHEN THE WITNESS, IN RESPONSE TO QUESTIONS FROM THE COMMONWEALTH, TESTIFIED THAT HE WAS THREATENED AFTER HE TESTIFIED AT THE PRELIMINARY HEARING. THE COUNSEL OBJECTED AND THE COURT SUSTAINED THE OBJECTION BUT THE COMMONWEALTH CONTINUED TO PURSUE THE THEME OF WITNESS INTIMIDATION WITHOUT CONNECTING IT TO [APPELLANT]. COUNSEL OBJECTS AGAIN AND ASKS FOR AN INSTRUCTION. THE COURT SUSTAINS THE OBJECTION AND TELLS THE ATTORNEY

FOR THE COMMONWEALTH TO STRIKE THE LAST RESPONSE BUT DOES NOT INFORM THE JURY TO DISREGARD THE ANSWER. THE COURT ACKNOWLEDGES THAT THE STATEMENTS OF THE WITNESS ARE HEARSAY BUT ALLOWED THE JURY TO HEAR THE TESTIMONY WITHOUT CLARIFYING INSTRUCTIONS.

SIJOURN[E]Y YOKLEY IS THE SISTER OF CARLOS COLON AND THE FORMER GIRLFRIEND OF [APPELLANT] AND THE MOTHER OF HIS CHILD. MS. YOKLEY'S TESTIMONY WAS INTERRUPTED WHEN SHE HESITATED IN HER TESTIMONY AND THE COMMONWEALTH ATTEMPTED TO REFRESH HER RECOLLECTION WITH A PRIOR STATEMENT. AFTER AN OBJECTION BY DEFENSE COUNSEL, THE COURT DISMISSED THE JURY AND CONDUCTED AN INQUIRY OF THE WITNESS AND ADVISED HER THAT SHE MAY BE INCRIMINATING HERSELF AND SHE HAS THE RIGHT TO CONSULT WITH AN ATTORNEY. THE WITNESS RESPONDED TO THE COURT'S INQUIRY THAT SHE DID NOT WISH TO CONTINUE HER TESTIMONY AND BY IMPLICATION WISHED TO CONSULT WITH AN ATTORNEY. THEREAFTER, THE WITNESS WAS DETAINED WHEN THE COURT TOLD THE COMMONWEALTH TO ISSUE A MATERIAL WITNESS WARRANT. THE WITNESS WAS TAKEN INTO CUSTODY. THE WITNESS RETURNED TO THE WITNESS STAND LATER THAT SAME AFTERNOON AND THE COMMONWEALTH PROCEEDED TO EXAMINE THE WITNESS ABOUT HER STATEMENT TO THE POLICE THAT WAS INCRIMINATING TO [APPELLANT]. THE RECORD DOES NOT REFLECT THAT THE WITNESS SPOKE TO AN ATTORNEY ABOUT HER 5TH AMENDMENT PRIVILEGE TO REFRAIN FROM GIVING INCRIMINATING TESTIMONY AGAINST HERSELF. THE LEARNED TRIAL COURT ERRED WHEN IT DID NOT AFFORD THE WITNESS AN OPPORTUNITY TO SPEAK TO COUNSEL DESPITE ASSURING HER THAT SHE WOULD HAVE THE OPPORTUNITY TO DO SO BEFORE REAPPEARING AS A WITNESS. THE LEARNED TRIAL COURT COMPOUNDED THE ERROR WHEN IT TOLD THE WITNESS THAT SHE WAS BEING PLACED IN THE CUSTODY OF THE SHERIFF AND *SUA SPONTE* ASKING THE COMMONWEALTH TO PREPARE A MATERIAL WITNESS WARRANT AND DETAIN THE WITNESS WHEN THE COMMONWEALTH DID NOT ASK THE COURT TO DO SO.

(Appellant's Brief at 3-4) (citations to record omitted).

In his first issue, Appellant avers Allante Johnson's testimony that he was threatened, his car was vandalized, and his telephone lines were cut, unduly prejudiced Appellant. Appellant submits Mr. Johnson's testimony inappropriately suggested Appellant intimidated Mr. Johnson so Mr. Johnson would not testify against Appellant. Appellant maintains the Commonwealth did not demonstrate Appellant was responsible for the threats to Mr. Johnson. Appellant alleges the court erred when it allowed Mr. Johnson to testify that he received threats and when it did not instruct the jury to disregard Mr. Johnson's testimony about the threats. Appellant concludes this Court should award Appellant a new trial. We disagree.

The standard of review for admission of evidence is as follows. "The admissibility of evidence is at the discretion of the trial court and only a showing of an abuse of that discretion, and resulting prejudice, constitutes reversible error." *Commonwealth v. Ballard*, 622 Pa. 177, 197-98, 80 A.3d 380, 392 (2013), *cert. denied*, ___ U.S. ___, 134 S.Ct. 2842, 189 L.Ed.2d 824 (2014).

> The term discretion imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion, within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where

the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

*Commonwealth v. Goldman*, 70 A.3d 874, 878-79 (Pa.Super. 2013), *appeal denied*, 624 Pa. 672, 85 A.3d 482 (2014). "To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *Commonwealth v. Lopez*, 57 A.3d 74, 81 (Pa.Super. 2012), *appeal denied*, 619 Pa. 678, 62 A.3d 379 (2013).

"In general, 'threats by third persons against…witnesses are not relevant [and thus not admissible into evidence] unless…the defendant is linked in some way to the making of the threats.'" *Commonwealth v. Bryant*, 462 A.2d 785, 788 (Pa.Super. 1983) (quoting *Commonwealth v. Carr*, 436 Pa. 124, 127, 259 A.2d 165, 167 (1969)) (brackets in original). "Nevertheless, an exception to the rule exists where the evidence in question was not offered to prove the accused's guilt 'but to explain a [witness's] prior inconsistent statement.'" *Bryant, supra* (quoting *Carr, supra*) (brackets in original). Generally, this kind of evidence is used "to rehabilitate the witness **after** the defense, in an effort to discredit the witness, has questioned the witness about the previous testimony." *Commonwealth v. Rickabaugh*, 706 A.2d 826, 838 (Pa.Super. 1997), *appeal denied*, 558 Pa. 607, 736 A.2d 603 (1999) (emphasis in original). Nonetheless, "the order of proof is a matter within the realm of…judicial discretion which will not be interfered with in the absence of an abuse thereof." *Commonwealth v. Smallwood*, 497 Pa. 476, 484, 442 A.2d

- 8 -

222, 225 (1982) (citing **Commonwealth v. Burns**, 409 Pa. 619, 627, 187 A.2d 552, 561-62 (1963)) (internal quotation marks omitted). **See also Commonwealth v. Smith**, 518 Pa. 15, 40, 540 A.2d 246, 258 (1988) (explaining trial court did not abuse its discretion when it permitted prosecution to admit prior consistent statements of witness in anticipation of announced defense before defense counsel had impeached witness on cross-examination); **Commonwealth v. Mokluk**, 444 A.2d 1214, 1217 (Pa.Super. 1982) (stating: "A trial court normally has discretion to admit out of order evidence in rebuttal of an anticipated defense. This discretion is abused only if it unduly prejudices one of the parties").

Due to the potential that the jury could use the evidence for some impermissible reason, a defendant is usually entitled to a cautionary instruction when evidence is admitted for a limited purpose. **Commonwealth v. Billa**, 521 Pa. 168, 180, 555 A.2d 835, 842 (1989). To establish the defendant suffered undue prejudice from the absence of a limiting instruction, he must demonstrate a reasonable probability that the outcome of the trial would have been different if the trial court had issued the instruction. **Commonwealth v. Hutchinson**, 611 Pa. 280, 306, 25 A.3d 777 (2011), *cert. denied*, ___ U.S. ___, 132 S.Ct. 2711, 183 L.Ed.2d 70 (2012). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." **Commonwealth v. Chambers**, 570 Pa. 3, 21-22, 807 A.2d 872, 883 (2002). In determining unjustifiable prejudice, a

court "must consider the totality of the evidence before the judge or jury." ***Commonwealth v. Simmons***, 569 Pa. 405, 430, 804 A.2d 625, 640 (2001).

Instantly, Allante Johnson testified at Appellant's preliminary hearing that he had witnessed Appellant shoot Robert Adams and Emerson Price. After the preliminary hearing, Mr. Johnson executed a written statement recanting his preliminary hearing testimony. Mr. Johnson also failed to appear at the first trial to testify for the Commonwealth. At Appellant's second trial, Mr. Johnson testified as a Commonwealth witness. On direct examination, Mr. Johnson explained he received several threats after the preliminary hearing, which caused him to fear for his and his family's safety if he testified against Appellant. Due to his fear of retaliation, Mr. Johnson stated he provided his written recantation statement and he did not appear to testify at the first trial. Mr. Johnson testified his written recantation was false and his preliminary hearing testimony was true. Defense counsel did not object to the order of proof regarding the Commonwealth's questioning Mr. Johnson about his prior inconsistent statement and the threats he received. Defense counsel also did not request a limiting instruction on Mr. Johnson's testimony about the threats.

Appellant does not establish the trial court acted with partiality, ill-will, or lack of support when it admitted Allante Johnson's testimony about the threats he received. The court correctly determined Mr. Johnson's testimony

regarding the threats was admissible to explain his prior inconsistent statement. *See Goldman, supra*; *Bryant, supra*. The court also did not abuse its discretion when it permitted the Commonwealth to question Mr. Johnson about his prior inconsistent statement before defense counsel had attempted to impeach Mr. Johnson. *See Smith supra*; *Mokluk supra*. Moreover, Appellant failed to object to the Commonwealth's examination of Mr. Johnson as out of order. *See* Pa.R.A.P. 302 (stating issues not raised in trial court are waived and cannot be raised for first time on appeal). *See also Commonwealth v. York*, 465 A.2d 1028, 1032 (Pa.Super. 1983) (stating new and different theory of relief may not be successfully advanced for first time on appeal).

Additionally, Appellant cannot show he suffered unfair prejudice due to the absence of a limiting instruction regarding Mr. Johnson's testimony or a reasonable probability that the instruction would have led to a different outcome at trial. The Commonwealth presented testimony from other witnesses, in addition to Allante Johnson, who identified Appellant as the shooter. The absence of a limiting instruction as to Mr. Johnson's testimony had no bearing on portions of his or any other witness' testimony that identified Appellant as the shooter, so Appellant's first issue merits no relief. *See Hutchinson, supra*.

In his second issue, Appellant asserts Sijourney Yokley said she did not want to continue to testify, and Appellant infers Ms. Yokley wished to

consult with counsel before she resumed her trial testimony, after the court advised her of her Fifth Amendment rights. Appellant submits Ms. Yokley did not speak with an attorney before she stepped back onto the witness stand. Appellant maintains the trial court erred when it permitted Ms. Yokley to resume her testimony at trial without speaking with counsel. Appellant avers the trial court also erred when it *sua sponte* ordered the Commonwealth to issue Ms. Yokley a material witness warrant. Appellant concludes this Court should award Appellant a new trial. We disagree.

Preliminarily, to preserve a claim of error for appellate review a party must make a specific objection to an alleged error before the trial court in a timely fashion and at the appropriate stage of the proceedings. **Commonwealth v. Charleston**, 16 A.3d 505 (Pa.Super. 2011), *appeal denied*, 612 Pa. 696, 30 A.3d 486 (2011); Pa.R.A.P. 302(a). Failure to raise a proper objection results in a waiver of the underlying issue on appeal. **See Charleston, supra**. Instantly, Appellant did not object at trial to Ms. Yokley's testimony on the basis that she had not spoken with counsel before she resumed her testimony. Appellant also did not object to the court's *sua sponte* instruction to the Commonwealth to issue a material witness warrant to Ms. Yokley. Accordingly, Appellant has waived his second issue for review on appeal.

Even if Appellant had not waived his second issue, we would conclude Appellant's second issue merits no relief, as the trial court opinion properly

disposed of the issue. (**See** Trial Court Opinion, filed on July 31, 2015, at 21-22) (finding: Appellant does not have standing to assert Fifth Amendment rights on behalf of Sijourney Yokley because Fifth Amendment rights are personal rights, which attach to testifying individual alone; Sijourney Yokley voluntarily chose to re-take witness stand after she stepped down; and Appellant did not object when Sijourney Yokley resumed her testimony).[2] Moreover, the trial court properly permitted Ms. Yokley to testify at trial regarding her prior statement for the purposes of impeachment and/or confirmation of her statement. Therefore, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/7/2016

_____

[2] We observe Appellant similarly lacks standing to assert the court erred when it *sua sponte* instructed the Commonwealth to issue Sijourney Yokley a material witness warrant.



# IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA
## CRIMINAL

| | |
|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** | CP-23-CR-2378-2012 |
| **v.** | |
| **Jamir Williams** | |

A. Sheldon Kovach, Esquire, Deputy District Attorney, for the Commonwealth
Douglas L. Smith, Esquire, for the Appellant

## OPINION

Capuzzi, J.                                                                    Filed: 7/31/2015

This is an appeal from Appellant's judgment of sentence entered on March 20, 2015. This case arose as the culmination of another brutal, senseless murder in the City of Chester triggered by what has been described as a minor altercation in a corner bar. Unfortunately for Emerson Price, III, Appellant, a man with neither self-control nor respect for life, felt disrespected and vowed to retaliate. Within a short period of time, Appellant retrieved a gun and returned to the same corner in order to administer "street justice." Appellant was hell-bent on avenging those who challenged his "street cred." At the conclusion, Emerson Price, III was dead and Robert Adams was seriously wounded. [1]

Appellant raises five issues on appeal: (1) The evidence was insufficient as a matter of law to sustain the conviction of Murder in the First Degree[2], Criminal Attempt to Commit Homicide[3], Aggravated Assault[4], and Possession of an Instrument of Crime[5]; (2) This Court erred when it permitted Commonwealth witness Carlos Colon to testify to threats Appellant made to him after the shooting that Appellant would kill Colon and Sijourney Yokley, Appellant's then girlfriend, if she left him as this was

---

[1] This was Appellant's second homicide trial within six months. He was convicted of first degree murder in October of 2014 for the murder of Rahim Hicks.
[2] 18 Pa.C.S. §2502(a)
[3] 18 Pa.C.S. § 901(a)
[4] 18 Pa.C.S. §2702(a)(1)
[5] 18 Pa.C.S. §907(a)

evidence of other crimes; (3) This Court erred when it permitted Sijourney Yokley to testify that

Appellant, subsequent to the shooting, threatened to kill her if she left him or mentioned the shooting to

anyone, as this was evidence of other criminal conduct; (4) This Court erred when it did not afford

Sijourney Yokley the opportunity to speak to counsel in reference to her 5th Amendment rights; and (5)

This Court erred when it did not give a clarifying instruction after it permitted hearsay statements from

Commonwealth witness, Allante Johnson in reference to witness intimidation. For the forthcoming

reasons, Appellant's allegations are without merit and Appellant's judgment of sentence should be

affirmed.

## FACTUAL BASIS

In October of 2010, Emerald Brown, (herein Emerald) 23, was living at 1003 Madison Street in

the City of Chester, Delaware County, Pennsylvania. [N.T., 2/10/2015 p. 41]. Emerald lived in the home

with her children and her mother, Sandra Brown (herein Ms. Brown); her two little brothers, Immanual

and Emerson Price III (herein Mr. Price); and cousins Bishop and Robert Adams (herein Mr. Adams).

[N.T., 2/10/2015 p. 42]. Mr. Price was commonly known by the nicknames his mother gave him, "Man-

Man" and "Memphis." [N.T., 2/10/2015 p. 42]. Mr. Price and his cousin, Mr. Adams, were very close.

[N.T., 2/10/2015 p. 44].

On Friday evening, October 29, 2010, into the morning hours of October 30, 2010, Emerald

Brown along with Sandra Brown, stepmother (unnamed), and Mr. Price's ex-girlfriend Keshana

Rochester (herein Ms. Rochester), attended a Halloween/birthday party at a rec center in Lamokin

Village. [N.T., 2/10/2014 p. 44-45]. Notwithstanding Mr. Price's breakup with Ms. Rochester, Emerald

remained friends as Ms. Rochester had a child with Mr. Price. [N.T., 2/10/2014 p. 45, 114]. Mr. Price and

Mr. Adams were not present at the party. [N.T., 2/10/2015 p.44]. The party ended around 1:00a.m., and

the group went back to 1003 Madison Street to get changed. [N.T., 2/10/2015 p. 46]. After they got

changed, Emerald and Ms. Rochester went to Ess's Bar located at Madison and Rose Street, two corners

down from Emerald's home. [N.T., 2/10/ 2015 p.47].

The two arrived at the bar around 1:30a.m., and sat down on two stools in the front of the bar to have a drink. There were a lot of people at the bar that evening, including Mr. Price, Mr. Adams and Appellant. [N.T., 2/10/2015 p. 48]. Approximately fifteen-twenty minutes after they arrived, a fight broke out between Appellant and another male named "Dub." [N.T., 2/10/2015 p.48]. Although Emerald isn't friends with Appellant, she recognized him from prior occasions and knows him by the nickname "Burgers." [N.T., 2/10/2015 p. 50].

The neighborhood of Rose and Madison is considered the East side of Chester, where Appellant is not from. [N.T., 2/10/2015 p. 53]. A group of guys crowded around Appellant. Emerald saw and heard Mr. Price telling Appellant: "you can't do this around here because we let you around here." [N.T., 2/10/2015 p. 52-56]. When the altercation turned physical, the bartender told everyone to leave. Ms. Rochester went over to the group to tell Mr. Price to leave and Appellant struck Ms. Rochester. [N.T., 2/10/2015 p. 56]. In response, Mr. Price told Appellant: "no one discresepcts my baby mother or puts their hands on them." [N.T., 2/10/2015 p. 56].

Shortly before 2:00a.m., the crowd moved outside of Ess's and Appellant stated: "no one better not be out here when I come back." [N.T., 2/10/2015 p. 57]. Appellant then drove off in a silver four door car. [N.T., 2/10/2015 p.61]. At this point, Emerald noticed Mr. Price standing down from the bar on the corner of Rose Street. [N.T., 2/10/2015 p. 62]. Emerald also saw "Bob" from their neighborhood begin an argument with Mr. Price. [N.T., 2/10/2015 p. 62]. Emerald saw Bob shove Mr. Price, so she ran down the street and told Bob to stop touching her little brother. [N.T., 2/10/2015 p. 63]. Bob had a gun in his hand and claimed he was going to shoot Ms. Rochester but did not point the gun at anyone. [N.T., 210/2015 p. 63]. The fight did not escalate, and he and Bob said they would talk about it later and Bob walked away. [N.T., 2/10/2015 p. 65].

Emerald, accompanied by Ms. Rochester and Mr. Price's friends, Antwain [ph] and Nier, [ph] walked back to 1003 Madison Street. . [N.T., 2/10/2015 p.70]. Mr. Price and Mr. Adams stayed on Rose Street. [N.T., 2/10/2015 p.70]. Ten minutes later, Mr. Price and Mr. Adams also came back to 1003 Madison Street. [N.T., 2/10/2015 p. 71]. Mr. Price went upstairs with Emerald and asked Emerald to get

Ms. Rochester out of the house so he could leave and head up the street to meet LaKiera, who lived on Madison, a few doors down from Ess's Bar. [N.T., 2/10/2015 p. 74]. Mr. Price also told Emerald that he and Bob shook hands and everything was cool. [N.T., 2/10/2015 p.71-73]. After their discussion, Emerald and Ms. Rochester left the house to walk to 7-Eleven. This was the last time Emerald would see her little brother alive.

While Emerald and Ms. Rochester were at 7-Eleven, Ms. Brown was home at 1003 Madison Street with Immanual and friend, Dory. [N.T., 2/10/2015 p. 120]. When the girls left, Mr. Price and Mr. Adams told her they were going up the street to see LaKiera. [N.T., 2/10/2015 p. 121]. Around 3:10a.m., Ms. Brown heard two, three gunshots in quick succession. [N.T., 2/10/2015 p. 121-123]. Seconds after, Mr. Adams came crawling in the front door. Ms. Brown asked him what happened and he said: "we got shot." [N.T., 2/10/2015 p. 121]. Ms. Brown asked where Man-Man was and Mr. Adams replied: "he's outback." [N.T., 2/10/2015 p. 121]. Ms. Brown rushed to the back door, unlocked it, and Mr. Price fell onto her. [N.T., 2/10/2015 p. 122-124]. Ms. Brown pulled Mr. Price fully inside, laid him down, and locked the door in fear of who else may be outside. [N.T., 2/10/2015 p. 122]. Ms. Brown woke up Dory and Immanuel and tried to keep Mr. Price and Mr. Adams awake by talking to them. [N.T., 2/10/2015 p. 122].

In the mist of the screaming and chaos, Ms. Brown called 911 and Immanuel instructed her to put towels on the bleeding. [N.T., 2/10/2015 p. 126]. Mr. Price kept telling her that he loved her. [N.T., 2/20/2015 p. 126]. When the police and ambulance arrived, Ms. Brown went with the officers to the hospital where Mr. Price was pronounced dead.

Officer Jonathan Ross is a patrolman with the City of Chester Police Department and has been so employed for the last nine years. [N.T., 2/10/2015 p. 135]. Officer Ross works particularly in the area of Madison and Rose Streets. [N.T., 2/10/2015 p. 137]. In the early morning hours of October 30, 2010, Officer Ross was on duty in full uniform in a marked patrol vehicle. [N.T., 2/10/2015 p. 140]. At approximately 3:23a.m., Office Ross was dispatched to 1003 Madison Street, the nature of the call being a frantic female on the line for a shooting. [N.T., 2/10/2015 p. 140]. Officer Ross, along with Officer

DeFrank [ph] and Officer Sabillian [ph], were the first to arrive on scene. [N.T., 2/10/2015 p. 140]. Ms. Brown was at the door of the home, very emotional and upset, screaming for them to help her child.

When the officers got inside the scene was very chaotic. [N.T., 2/10/2015 p. 141]. Officer Ross observed Mr. Price and Mr. Adams laying on the ground roughly a foot and a half from each other. [N.T., 2/10/2015 p. 144]. Officer Ross observed that Mr. Price had a chest wound and Mr. Adams had wounds in his upper chest, torso, and pelvic area. [N.T., 2/10/2015 p. 144]. Their first priority was treating the victims but also trying to figure out what happened. [N.T., 2/10/2015 p. 144-147]. The victims were giving the officers bits and pieces, while gasping for air and asking where the ambulance was. [N.T., 2/10/2015 p. 145]. Mr. Price told Officer Ross that a black male wearing all black emerged from an unknown location in the 300 block of Rose Street. [N.T., 2/10/2015 p. 149]. Officer Ross provided that information to Captain Chubb, who was outside of the house attempting to secure a crime scene. [N.T., 2/10/2015 p. 150]. Mr. Price and Mr. Adams were transported by ambulance to Chester Crozer Medical Center. [N.T., 2/10/2015 p. 156]. Officer Ross took Ms. Brown to the hospital. [N.T., 2/10/2015 p. 159].

When Emerald approached 1003 Madison, there were cops outside and her little brother Immanuel and her Aunt Dory immediately took Emerald to the hospital, where Mr. Price was pronounced dead. [N.T., 2/10/2015 p. 77]. Later that day, Emerald gave a statement to police about the evening and identified Appellant in a photo array as the man who was at the bar fighting that evening.[6][N.T., 2/10/2015 p.80-84].

Detective David McDonald is employed by the Delaware County Criminal Investigation Division, herein "CID." Detective McDonald has been employed with CID as a Detective in the Forensic Unit for the past seven years and worked as a police officer prior to that for twenty-five years. [N.T., 2/11/2015 p. 57]. During the early morning hours of October 30, 2010, Detective McDonald was on call and received a request to respond to the area of Rose and Madison in order to assist Chester Police Department with a crime scene for a double shooting. [N.T., 2/11/2015 p. 57].

---

[6] See Commonwealth Exhibit C-3 Statement of Emerald Brown.

Upon arrival, Detective McDonald was directed up towards Rose Street in the area of Ess's Bar. There was a marked patrol vehicle on that corner as well as one at the opposite end of Rose Street to protect the scene. [N.T., 2/11/2015 p. 58]. Detective McDonald was then directed to 316 Rose Street where a 25 caliber fired cartridge casing had been located. [N.T., 2/11/2015 p. 59-60]. As the investigation progressed, Detective McDonald became aware that the victims ran from Rose Street to 1003 Madison, approximately a block and a half away. [N.T., 2/10/2015 p. 61]. At that point, Detective McDonald proceeded to 1003 Madison and, in the rear of the residence located several items of evidentiary value including a wool hat, blue jacket, and a cell phone. [N.T., 2/11/2015 p. 63].

Detective McDonald was on scene for an hour. After departing, Detective McDonald received information that he needed to return because the crime scene had shifted to the 1100 block of Madison. [N.T., 2/11/2015 p. 64]. Detective McDonald, along with Lieutenant Byerly of CID, Detective Michael Jay of CID, and Chester Detective Pat Mullen arrived back on scene.[N.T., 2/11/2015 p. 64]. Detective McDonald located two fired projectiles, one in front of 1113 Madison and the other in front of 1103 Madison. [N.T., 2/11/2015 p.64-65]. Detective McDonald photographed all of the evidence in relation to this case but the evidence was eventually turned over to Detective Mullen. [N.T., 2/11/2015 p. 70].

On July 12, 2011, Allante Johnson (herein Mr. Johnson) gave Chester Detective Randy Bothwell and CID Detective Michael Jay, a statement in reference to the shooting of Mr. Price and Mr. Adams.[7] [N.T., 2/11/2015 p. 119]. Mr. Johnson is a cousin of both victims. On October 30, 2010, Mr. Johnson was at Ess's Bar on Madison and Rose Streets. He witnessed a fight in the bar but did not see it get physical. Later on, as Ess's was clearing out, he was walking towards Madison Bar, a bar further up the street, and saw his cousins walking up Madison Street towards Ess's. Mr. Johnson also noticed a silver four door car with rims being driven by a female driver come up Madison Street. Mr. Johnson saw a guy jump out of the passenger side of the car and walk up to his cousins while the car turned the corner onto Rose Street. Mr. Johnson saw the man, he identified as "Burgers" and" Jamir," pull a gun out of his pocket and start

---

[7] See Commonwealth Exhibit C-27 Statement of Allante Johnson.

shooting at his cousins who started running down Madison Street. During the statement, Mr. Johnson identified Appellant as the shooter from a photo array.

On February 16, 2012, Carlos Colon (herein Mr. Colon) gave a statement to Detective Randy Bothwell and Detective Michael Jay in reference to the homicide of Emerson Price, III[8]. [N.T., 2/10/2015 p. 256]. Back in October of 2010, Mr. Colon was living in Crosby Square Apartments in the City of Chester with Appellant, his sister Sijourney Yokley, and her children. [N.T., 2/10/2015 p. 239]. Mr. Colon knew Appellant because he had a child with his sister and considered Appellant "like a big brother." [N.T., 2/10/2015 p. 238]. In his statement, Mr. Colon told police that in the early hours of October 30, 2010, he was at his sister's in Crosby Square, which is roughly five minutes from Ess's Bar. Appellant, or "Burgers" came back to the apartment and told Ms. Yokley and Mr. Colon that they needed to take a ride with him. Mr. Colon had no idea where they were going that evening. Appellant first told them to stop at a Citgo to get dutchies to smoke weed. As they were coming up Madison Street, they saw two men walking towards Ess's Bar. After seeing the men, Appellant told Ms. Yokley to park around the corner on Rose Street. Appellant got out of the car, and five minutes later Mr. Colon heard four or five shots. Appellant walked back to the car and told Ms. Yokley to drive back to Crosby Square. When he got back into the vehicle, Mr. Colon saw a black and brown revolver in Appellant's hand. Appellant told Mr. Colon that he was fighting with the two men in Ess's Bar earlier that evening.

Some days after the shooting, Appellant was in the car with Ms. Yokley and Mr. Colon. Ms. Yokley tried to tell Appellant that she was through with dating him, and in response Appellant stated: "bitch, you're pregnant and you got my baby bitch I'll kill you." Appellant pulled out the same gun from the night of the shooting and pointed it at Mr. Colon and Ms. Yokley and said: "bitches you tell anybody I'll kill both of you all."[9]

---

[8] See Commonwealth Exhibit C-13 Statement of Carlos Colon.
[9] See Commonwealth Exhibit C-13, page 6

The following day, February 17, 2012, Sijourney Yokley (herein Ms. Yokley) gave Detective

Michael Jay and Detective Randy Bothwell a statement in reference to the homicide of Emmerson Price.[10]

Ms. Yokley stated that on October 30, 2010, she was at 501 Bar with her friends. Around 2:00a.m., she

was leaving 501 bar and Appellant approached her and told her he had gotten in a fight at Ess's on

Madison Street. Ms. Yokley got into a silver Aurora along with Appellant and her brother, Mr. Colon.

She was driving. They stopped at the Citgo. In addition, they stopped at a house on Rose Street, where

Appellant went inside and came back out with a gun. As they were heading up Madison Street, she saw

two males walking. Appellant got out of the car and shook one of the male's hands. Ms. Yokley pulled

off and parked on Rose Street. She heard gunshots and saw Appellant running back up to the car. After

that, she drove to the RS afterhours club in Ridley for Appellant to meet someone who never showed and

then home to Crosby Apartments. Ms. Yokley also stated that Appellant had threatened to kill her in

reference to this incident multiple times.

On September 6, 2012, Detective Tyler and Detective Bothwell obtained a statement from Jeffrey

Rose (herein Mr. Rose), Mr. Adams' cell mate at George W. Hill Correctional Facility back in April

2012-August of 2012.[11] While they were cell mates, Mr. Adams told Mr. Rose that he and his cousin were

victims of a shooting in Chester after they were leaving the bar. Mr. Rose stated:

> "One night after they left the bar that the shooter approached him, shot one time with a 38, missed
> him, two more shots he let go, hit the victim in the chest, and the last three shots hit Robert
> Adams Jr. I think I believe in the back, the side, and the leg. Um he told me that the victim I mean
> that the shooter didn't have a mask on so he knew who he was." [12]

Mr. Rose also stated that Mr. Adams said his cousin had an altercation with the shooter earlier in

the evening. Mr. Adams didn't give a name of the shooter during the conversation but also said that a

female was driving the car the shooter got out of. Mr. Adams also stated that he wasn't cooperating with

the investation because he "wasn't no snitch."

---

[10] See Commonwealth's Exhibit C-18 Statement of Sijourney Yokley
[11] See Commonwealth Exhibit C-21 Statement of Jeffrey Rose
[12] See Commonwealth Exhibit C-21 page 2

## PROCEDURAL HISTORY

On or about February 21, 2012, Appellant was arrested and charged with First Degree Murder for the death of Emerson Price III, Attempted Homicide for the shooting of Robert Adams and related charges. Michael J. Malloy, Esquire entered his appearance on behalf of Appellant.

On May 8, 2012, The Commonwealth filed its Notice of Aggravating Circumstances Pursuant to *Pa.R.Crim.P. 802.* Scott Galloway, Esquire was appointed to represent Appellant in all matters pertaining to penalty phase. The case was originally assigned to The Honorable Patricia Jenkins; however, was re-assigned to this Court in January of 2014.

After investigation, the Commonwealth withdrew the Notice on June 11, 2014. On June 23, 2014, This Court permitted Scott Galloway to withdraw his appearance as his representation in the penalty phase was no longer necessary.

Several pre-trial motions *in limine* were filed on behalf of Appellant. This Court issued an order on September 2, 2014, granting Appellant's request for Mr. Johnson's phone records from George W. Hill Correctional Facility for the years 2012, 2013, and 2014. On December 16, 2014, this Court granted Appellant's motion to preclude testimony of any possession of weapons prior to the date of the incident and ordered that there would be no testimony as to the incident at J&S Seafood, where Appellant was charged with another homicide docketed at 3302-2012[13]. On January 20, 2015, this Court granted Appellant's request for George W. Hill to produce any notes or records of Carlos Colon and any disciplinary records of Carlos Colon.

A jury was selected on December 5, 2014 and trial commenced on December 16, 2014. However, due to defense counsel's very serious family emergency on December 17th and without objection by Appellant, this Court declared a mistrial and rescheduled trial for February 2015.

Based upon the testimony at the mistral, Appellant filed a motion to preclude the following testimony: (1) statement from victim, Mr. Price, to his sister Emerald Brown that Bob and Mr. Price shook hands after their argument; (2) Mr. Colon's testimony that after the shooting Appellant threatened

---

[13] Appellant was convicted in that case on October 23, 2014 and it is currently on appeal.

him while brandishing the same gun used in the homicide; (3) Mr. Colon's testimony that Appellant stole money from his family subsequent to the alleged incident. This Court denied Appellant's first two requests but granted the third.

A jury was selected on February 6, 2015. The Commonwealth informed this Court they were proceeding on Count 1: Murder in the First Degree; Count 2: Murder in the Third Degree, Count 3: Criminal Attempt to Homicide; Count 4: Aggravated Assault Serious Bodily Injury Caused; and Count 7: Possessing an Instrument of Crime. [N.T., 2/10/2015 p. 6].

On February 10, 2015, trial commenced. The Commonwealth called Emerald Brown, Sandra Brown, Officer Jonathan Ross, and Detective David McDonald who testified to the facts as stated above. In addition, the Commonwealth also elicited testimony from Carlos Colon, Sijourney Yokley, Allante Johnson, as well as, Deputy District Attorney Stephanie Wills, Esq., Corporal Jeffrey Dietz, Detective Louis Grandizio, Donald Beese, Jeffrey Rose, Doctor Allen Gabroy, M.D., and Doctor Bennett Preston, M.D.

Carlos Colon testified consistent to the statement he gave police. In addition, Mr. Colon testified that the vehicle they used to drive Appellant on the evening of October 30, 2010, was a silver four door Oldsmobile with rims and that when Appellant got back into the vehicle, he told him that he walked up to the two guys they saw walking on Madison Street, shook his hand with his right hand and then shot him with his left hand. [N.T., 2/10/2015 p. 241-254]. Mr. Colon also testified that some days after the incident, he, Appellant and Ms. Yokley were in the car and Appellant specifically said he would kill the both of them if they talked about the shooting. [N.T., 2/10/2015 p. 257]. Mr. Colon also testified that although he entered into a plea agreement with the Commonwealth on August 23, 2012 for gun charges he was facing, he later withdrew from the agreement and entered a plea in that case on November 9, 2012. [N.T., 2/10/2015 p. 268]. In addition to that case, Mr. Colon also testified that he pled guilty to assaulting a corrections officer and to possession with intent to deliver in Lancaster County, for which he is

currently incarcerated. [N.T., 2/10/2015 p. 270]. Mr. Colon had no plea agreement with the Lancaster County District Attorney's Office to testify against Appellant. [N.T., 2/10/2015 p. 271].[14]

Sijourney Yokley's initial trial testimony as to where she, Appellant, and Mr. Colon were headed once they picked her up from 501 bar differed from her statement given in February of 2012. [N.T., 2/10/2015 p. 320-321]. This Court, after a sidebar with counsel, sent the jury back to the jury room and warned Ms. Yokley that she could be subjecting herself to perjury if she was lying on the stand or if she had lied in the statement before and told her she had a right to seek counsel. [N.T., 2/10/2015 p.322-323]. Ms. Yokley did not wish to continue to testify at the time; however, after giving Ms. Yokley time to think, she proceeded to testify and counsel continued with his direct. Ms. Yokley stated she did remember giving a statement to police and remembered reviewing it prior to trial. [N.T.,2/11/2015 p.328-329]. Ms. Yokley recalled telling the detectives that they went to the Citgo to get rolling papers and then saw the two men on Madison street. [N.T., 2/10/2015 p.330- 331].

Allante Johnson testified that he did not appear for the hearing in December because he was scared of what would happen to him back home in Chester if he did. [N.T., 2/11/2015 p. 109]. Mr. Johnson was frightened because prior to December his car was vandalized and the words "die rat" were written on the back. [N.T., 2/11/2015 p. 111]. Mr. Johnson testified he was not blood cousins with the victims but that their mothers had grown up together. [N.T., 2/11/2015 p. 112]. Mr. Johnson testified consistently with his statement that he saw Appellant on Madison Street get out of a silver four door sedan, approach Mr. Price and Mr. Adams and fire shots. [N.T., 2/11/2015 p. 115-120]. In addition, Mr. Johnson testified that he had entered into a plea agreement with the Commonwealth in connection with his testimony but that it was no longer valid because he did not show up in December. [N.T., 2/11/2015 p. 132].

---

[14] The Commonwealth presented testimony from Christopher Larson, First Assistant District Attorney of Lancaster County who testified that he is currently handling Mr. Colon's Lancaster County case and that Mr. Colon has not received any consideration on his Lancaster case for his testimony in the homicide of Emerson Price. [N.T., 2/11/2015 p. 20-26].

Mr. Johnson also stated that subsequent to his testimony at the preliminary hearing, his mother called defense counsel, Mr. Malloy. [N.T., 2/11/2015 p. 138]. Mr. Malloy went to visit Mr. Johnson in prison where they met in the visiting room. [N.T., 2/11/2015 p. 138]. They had a conversation about Mr. Johnson's testimony at the preliminary hearing conducted on April 13, 2012. Mr. Malloy wrote down his questions and Mr. Johnson's answers.[15] The conversation written down by defense counsel states that Mr. Johnson said he lied at the preliminary hearing because he was afraid of a long jail sentence for his new drug case and probation violation. Mr. Johnson was not present on the night the shooting occurred and did not see Jamir Williams shoot anyone. [N.T, 2/11/2015 p. 139-141].

Mr. Johnson testified that what he told defense counsel in that conversation was not true and that he only gave this statement to defense counsel because he did not want anything happening to him or to his family, who reside in Chester. [N.T., 2/11/2015 p. 142-143].

Stephanie Wills, Esquire, Deputy District Attorney for the Delaware County District Attorney's Office testified in relation to the plea agreement with Allante Johnson. Ms. Wills testified that Mr. Johnson provided a statement to police in July of 2011 in connection with the shooting prior to a plea agreement even being memorialized, which did not occur until November 29, 2011. [N.T., 2/11/2015 p.216]. Ms. Wills prepared the plea agreement involving Mr. Johnson's cooperation in the homicide and his underlying drug prosecution and was directly involved with Mr. Johnson and his attorney.[16] [N.T., 2/11/2015 p. 215]. The agreement stated that Mr. Johnson was not promised anything in return for his testimony; rather Mr. Johnson would plead guilty to his PWID charge and the Commonwealth, at the time of sentencing, would explain to the sentencing judge his cooperation in the prosecution of Appellant. [N.T., 2/11/2015 p. 218]. However, due to Appellant's failure to appear to testify in December of 2014, he violated the agreement and it was no longer valid at the time he testified. [N.T., 2/11/2015 p. 234-236]. Ms. Wills formally revoked the agreement via letter.[17]

---

[15] See Commonwealth Exhibit C-31.
[16] See Commonwealth Exhibit C-28.
[17] See Commonwealth Exhibit C-32.

Corporal Jeffrey Dietz has been employed with the Pennsylvania State Police since 1995 as a firearm and tool mark examiner. [N.T., 2/11/2015 p. 73-75]. As a firearm and toolmaker examiner, some of his duties include: conducting forensic examinations on firearms, discharged bullets, shot shells and cartridge cases to see if they were fired by a particular firearm; testing firearms to determine if they are safe and operable; providing investigators with a list of firearms that bullets could have been discharged from; examining clothing or other objects that may have been struck by a bullet in order to determine approximate muzzle or target distance., etc. [N.T., 2/11/2015 p. 75]. Corporal Dietz was qualified and testified as an expert in firearms and tool mark examinations. [N.T., 2/11/2015 p. 76]. Corporal Dietz performed an examination on two discharged and mutilated metal jacketed bullets that were recovered from Mr. Price's body and submitted to the Pennsylvania State Police. [N.T., 2/11/201 5p. 78]. After a thorough examination, Corporal Dietz opined that both projectiles had been fired from the same firearm. [N.T., 2/11/2015 p. 84]. In addition, Corporal Dietz opined that, based on the grain weight of the bullets and the size that they were most likely discharged from a 38 or a 357 caliber revolver. [N.T., 2/11/2015 p. 85]. [18]

Detective Louis Grandizio also testified at trial. Detective Grandizio is employed with the Delaware County Criminal Investigation Division as a firearms and tool mark examiner. [N.T., 2/11/2015 p. 89-91]. As a firearms and tool mark examiner his duties include: identifying firearms by make, model, caliber, and country of origin; test firing firearms for operability; conducting microscopic comparisons of fired cartridge cases, bullets, and bullet specimens; performing trajectory studies for distance determination and gunshot residence pattern testing. [N.T., 2/11/2015 p. 89]. Detective Grandizio qualified and testified as an expert in firearms and tool mark examinations. [N.T., 2/11/2015 p. 92].

In regard to the homicide of Mr. Price, Detective Grandizio was provided with two bullet specimens that he received from Detective Michael Jay on September 14, 2012. [N.T., 2/11/2012 p. 98]. As a result of his analysis, Detective Grandizio determined that the bullets were fired from one particular firearm, the firearm being unknown to him at the time. [N.T., 2/11/2015 p. 98]. After Detective Jay asked

---

[18] Corporal Dietz's lab report was marked as C-23.

for a cross-check, which is done by taking evidence from one job and comparing it to another incident, Detective Grandizio was provided with two additional projectiles that came from the Pennsylvania State Police Lab. [N.T., 2/11/2015 p. 99]. Detective Grandizio determined that all of the projectiles, the two he was provided and the two from the PA State Police Lab were all fired from one particular firearm. [N.T., 2/11/2015 p. 99]. Detective Grandizio opined that the caliber was a 38/357 type class; which are generally expelled from revolvers. [N.T., 2/11/2015 p. 100]. [19]

Mr. Rose testified to his statement and conversation with Mr. Adams. In addition, Donald Beeese, investigator at George W. Hill Correctional Facility testified that Mr. Adams and Jeffrey Rose were cellmates for a period of two weeks from 7/12/2012 to 7/23/2012. [N.T., 2/11/2015 p. 104].

Mr. Adams testified that he did not know who the shooter was because the shooter was wearing a mask, that he did not know who was involved in the altercation at the bar earlier that evening, and that he had no idea who Jeffrey Rose was. [N.T., 2/11/2-15 p. 183-206].

Dr. Allen Gabroy, M.D., now retired, was employed at Chester Crozer Medical Center in October of 2012. [N.T., 2/11/2015 p. 4]. Dr. Gabroy qualified and testified as an expert in the field of general surgery and surgical critical care. [N.T., 2/11/2015 p. 7]. In the early morning hours of October 30, 2010, Dr. Gabroy was working as a trauma surgeon and cared for Mr. Price. [N.T., 2/11/2015 p. 8]. Dr. Gabroy explained the extensive injuries to Mr. Price and the procedures undertaken to save his life, which were not successful. Mr. Adams died at 5:50 that morning. [N.T., 2/11/2015 p. 8-14].

Dr. Gabroy also reviewed Mr. Adams' chart and testified that Mr. Adams had been shot in the chest and in the abdomen and required an operation for the abdomen wound which went through his colon and small bowel. [N.T., 2/11/2015 p. 15]. Dr. Gabroy testified that without the immediate surgery, the result would have been death. [N.T., 2/11/2015 p. 16]. [20]

On February 12, 2015, the Commonwealth presented its last witness, Dr. Bennett Preston, who has been a medical examiner since 1986 and has been conducting autopsies for Delaware County since

---

[19] Detective Grandizio's ballistics report was marked as C-25.

[20] The medical chart of Emerson Price was marked as C-20 and the medical chart of Robert Adams was marked as C-11.

2000. [N.T., 2/12/2015 p. 4]. Dr. Preston was qualified and testied as an expert in pathology and forensic pathology. Dr. Preston performed the autopsy on Mr. Price on October 30, 2012.[21] Dr. Preston opined that the cause of death was multiple gunshot wounds and the manner of death was homicide. [N.T., 2/12/2015 p. 15].

The Commonwealth rested and the defense did not present any witnesses.

The jury returned the following verdict: Count 1: Murder of the First Degree- Emerson Price, GUILTY; Count 3: Criminal Attempt Homicide-Robert Adams, GUILTY[22]; Count 4: Aggravated Assault: Robert Adams, GUILTY[23]; Count 7: Possession of Instrument of Crime, GUILTY.

On March 20, 2015, this Court sentenced Appellant as follows: Count 1 : life without parole; Count 3: 240 to 480 months consecutive to Count 1; Count 7: 30 to 60 months consecutive to Count 1and 3. Count 4 merged with Count 3 for sentencing purposes. [N.T., 3/20/2015 p.29]. [24]

On April 1, 2015, This Court appointed Douglas Smith as appellate counsel. Counsel filed a notice of appeal on April 6, 2015. This Court issued a 1925(b) Order and granted counsel's request for additional time to file his answer. On June 17, 2015, counsel filed a timely statement of matters complained of on appeal.

## DISCUSSION

### 1) The Evidence Presented at Trial was Sufficient as a Matter of Law to Sustain All of Appellant's Convictions.

Appellant contends the evidence presented at trial was insufficient to sustain his convictions for Murder in the First Degree[25], Criminal Attempt to Commit Murder[26], Aggravated Assault[27], and Possession of an Instrument of Crime[28].

---

[21] Dr. Preston's autopsy report was marked as C-34.

[22] The jury also found that Robert Adams suffered serious bodily injury as a result of the attempted homicide.

[23] The jury also found that Robert Adams suffered serious bodily injury as a result of the aggravated assault.

[24] Appellant was also sentenced to life without parole plus 30 to 60 months on transcript 3302-2012, where Appellant murdered Rahim Hicks and injured Deron Hudson.

[25] 18 Pa.C.S. §2502(a).

[26] 18 Pa.C.S. §901(a).

[27] 18 Pa.C.S. §2702(a)(1).

[28] 18 Pa.C.S. §907(a).

"Because evidentiary sufficiency is a question of law, our standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Diamond*, 83 A.3d 119, 126 (Pa. 2013). "There is sufficient evidence to sustain a conviction when the evidence admitted at trial, and all reasonable inference drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict-winner, are sufficient to enable the fact finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt." *Commonwealth v. Martin*, 101 A.3d 706, 718 (Pa. 2014). Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt, the sufficiency of evidence claim must fail. *Commonwealth v. Kelly*, 78 A.3d 1136, 1139 (Pa. Super. 2013). The Commonwealth may sustain its burden by means of wholly circumstantial evidence. *Martin*, at 718.

## A. The Evidence Was Sufficient to Sustain Appellant's Conviction for Murder in the First Degree.

In order to sustain a conviction for first degree murder, the evidence must have proved beyond a reasonable doubt that: (1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill. *18 Pa.C.S. §2502(a); Commonwealth v. Martin*, 101 A.3d 706, 719 (Pa. 2014). Specific intent and malice can be inferred from the use of a deadly weapon on a vital part of a victim's body. *Commonwealth v. Burno*, 94 A.3d 956, 969 (Pa. 2014).

Appellant's contention that the evidence presented was insufficient to convict him of murder in the first degree lacks factual and legal support. The medical examiner, Dr. Bennett Preston, testified that the cause of death of Emerson Price was a gunshot wound and the manner of his death was a homicide. Consequently, the first element, the unlawful killing of a human being, was established.

The second element, i.e. Appellant was the perpetrator responsible for the death of Emerson Price, and the third element, that he acted with malice and a specific intent to kill Emerson Price were unequivocally proven beyond a reasonable doubt by the eyewitness testimony placing Appellant at the scene with a hand gun and firing the shots that struck Emerson Price and Robert Adams. Furthermore, the

Commonwealth methodically built the foundation through the testimony of the various witnesses and the exhibits entered into evidence.

Despite the threats made against him and despite his plea agreement having been terminated for non-cooperation, Allante Johnson testified that he saw Appellant get out of a silver car with rims that was driven by a female, and saw Appellant shoot at both Mr. Price and Mr. Adams.

Although the versions of events as testified to by Johnson, Mr. Colon and Ms. Yokley differed slightly, the salient operable facts regarding the event were consistent and neatly meshed together to form a vivid and stark picture of the murder. Ms. Yokley was the driver of silver car with rims; Mr. Colon was a rear seat passenger; and Appellant was in the front passenger seat. [N.T., 2/10/2015 p. 331]. As the silver car was traveling up Madison Street toward Rose Street, Appellant pointed out two men walking down Madison Street. [N.T., 2/10/2015 p. 331]. Appellant got out of the vehicle and told Ms. Yokley to turn down Rose Street. Within minutes, both Ms. Yokley and Mr. Colon heard gunshots. [N.T., 2/10/2015 p. 249]. Ms. Yokley then saw Appellant running towards the vehicle, while Mr. Colon saw the gun in Appellant's hand when he got back in the car. [N.T., 2/10/2015 p. 251]. Appellant told Ms. Yokley and Mr. Colon that he was fighting with these men earlier in the evening. [N.T., 2/10/2015 p. 251].

Jeffrey Rose testified that his former cellmate, Robert Adams, told him he and his cousin were the victims of shooting over an argument in a bar earlier in the evening. [N.T., 2/11/2015 p. 43-45].

The testimony of the above individuals places Appellant at the scene with a weapon when gunshots are heard, and Allante Johnson specifically identifies Appellant as the shooter. Thus, there was an abundance of direct and circumstantial evidence from different sources that satisfy the second element of the charge.

Appellant's actions, commencing with the altercation in Ess's Bar, demonstrate actual malice and specific intent. Appellant left Ess's Bar that evening threatening that people better not be around when he got back. Appellant then picked up Mr. Colon and Ms. Yokley, stating that he needed a driver. Appellant then navigatged his way around Chester to find Mr. Price and Mr. Adams walking down Madison Street.

Appellant jumped out of the vehicle and told Ms. Yokley to continue to Rose Street. Appellant went up to the victims, pulled out a gun and began shooting, repeatedly firing shots in rapid succession; both victims' sustaining multiple gunshot wounds. Appellant's callous execution of Emerson Price, III and attempted execution of Robert Adams was nothing short of cold, calculated murder, and, as such, the conviction should be affirmed.

**B. The Evidence was Sufficient to Sustain Appellant's Conviction for Criminal Attempt to Commit Homicide.**

"A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." *18 Pa.C.S.A. § 901(a).* "A person may be convicted of attempted murder if he takes a substantial step toward the commission of a killing, with the specific intent in mind to commit such an act." *Commonwealth v. Jackson,* 955 A.2d 441, 444 (Pa. Super. 2008).

After the altercation in Ess's Bar, Appellant left the area, but vowed to return. Appellant subsequently secured a vehicle, retrieved a gun, and then had Sijourney Yokley drive him back to the area of Ess's Bar in order to consummate the threat he made, i.e. "no one better not be out here when I get back." [N.T. 2/10/2015 p. 57]. Upon his arrival back in the area, Appellant exited the car, raised his weapon and then fired several shots directly at Mr. Adams, with three shots striking Mr. Adams. [N.T. 2/10/2015 p. 199]. Dr. Gabroy testified that injuries Mr. Adams sustained caused serious bodily injury and without being treated as quickly as they were, Mr. Adams would have died. [N.T. 2/11/2015 p. 16].

The testimony categorically demonstrated numerous steps taken by Appellant toward the attempted murder of Robert Adams. Fortunately for Appellant, excellent trauma care received by Mr. Adams at Crozer-Chester Medical Center saved Appellant from a second murder charge in this case. Therefore, based on the evidence presented, Appellant's conviction for attempted murder should be affirmed.

**C. The Evidence was Sufficient to Sustain Appellant's Conviction for Aggravated Assault Serious Bodily Injury.**

"A person is guilty of aggravated assault if he attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." *18 Pa.C.S.A. § 2702(a)(1)*.

Appellant's argument that the evidence was insufficient to sustain a conviction for aggravated assault causing serious bodily injury is wholly without merit. Appellant walked up to Mr. Adams, fired several shots at him, and ran away, manifesting extreme indifference to the value of Mr. Adams life. Dr. Gabroy testified as to the serious bodily injured that the shots caused to Mr. Adams and the jury found beyond a reasonable doubt that serious bodily injury did occur. As such, Appellant's argument is devoid of merit.

**D. The Evidence was Sufficient to Sustain Appellant's Conviction for Possession of Instrument of Crime.**

"A person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally." *18 Pa.C.S.A. § 907*.

Appellant's argument is wholly without merit. Mr. Johnson, Ms. Yokley, and Mr. Colon all saw Appellant with a gun that evening. Appellant used the gun to kill Mr. Price and seriously injure Mr. Adams. Therefore, the conviction should be affirmed.

Appellant's 1925(b) statements claims that Mr. Johnson, Ms. Yokley, and Mr. Colon were incredible witnesses because they gave inconsistent statements to police and had motive to fabricate their testimony to the jury and this is why the evidence was insufficient. This Court does not find such an argument to be a sufficiency question but rather a question as to the weight of the evidence presented, which is not specifically raised in Appellant's 1925(b). However, this Court notes that the jury was free to believe all, some, or none of the evidence presented. The jury determined that the witnesses, although their statements had some inconsistencies were credible.

**2) This Court Did Not Abuse its Discretion When Permitting Carlos Colon and/or Sijourney Yokley to Testify About Threats Made By Appellant After the Shooting.**

The admissibility of evidence is at the discretion of the trial court and subject to review for abuse of discretion. An abuse is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will direction is abused. *Commonwealth v. Hairston,* 84 A.3d 657, 664-65 (Pa. 2014).

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. *Pa.R.E. 404(b)(1).* "Evidence of other crimes may be admitted where such evidence is part of the history of the case and forms part of the natural development of the facts." *Commonwealth v. Ferguson,* 107 A.3d 206, 211 (Pa. Super. 2015).

Appellant asserts that Carlos Colon and Sijourney Yokley's testimony elicited other criminal conduct by Appellant.[29] This Court properly denied Appellant's pre-trial motion *in limine* to exclude that testimony and properly allowed Mr. Colon and Ms. Yokley's testimony at trial that Appellant threatened to kill them if they spoke of the shooting.

In his pretrial motion, counsel argued, "the evidence should have been prohibited because the threats were not made in reference to the crime in question and therefore not relevant and serve no other purpose than to present an uncharged crime against the defendant which is not relevant and will cause substantial prejudice to the defendant." This assertion is completely erroneous because the threats were made to silence these two witnesses from coming forward with evidence of the homicide committed by Appellant. The mere fact that Appellant was not charged with witness intimidation does not render the threats irrelevant. Likewise, this testimony did not cause substantial prejudice, as the testimony as to Appellant's culpability in the crimes charged was overwhelming. Furthermore, this testimony presented the jury with a clearer picture of the development of the case, given Appellant's attempts to discredit the

---

[29] Although counsel addresses these arguments as separate points in his 1925(b) statement, this Court will address them in tandem because they are the same issue.

timeliness and completeness of the investigation, (murder on October 30, 2010) and the filing of the charges (February 21, 2012). [N.T., 2/10/2015 p 296]; [N.T., 2/11/2015 p. 161]; [N.T., 2/12/2015 p. 37].

In Appellant's 1925(b) statement, counsel alleges the testimony showed evidence of other crimes. The testimony was not provided to prove Appellant's character or in order to show any actions in conformity therewith. The testimony from both witnesses was part of the sequence of events after the crime was committed and was not offered as evidence under 404(b) as counsel's argument appears to be alleging. The evidence was highly relevant and was offered for the sole purpose of demonstrating why Ms. Yokley and why Mr. Colon did not immediately come forward. Equally telling, the prosecution in closing argument did not touch upon this, further showing that this was not offered as evidence of a crime.

### 3) Appellant Was Not Prejudiced By My. Yokley's Decision to Continue With Testifying Despite Any Fifth Amendment Rights.

It is a longstanding principle that the right of a witness to refuse to testify on the ground that his testimony may incriminate him is a right personal to him alone. The person against whom the witness is called has no rights in relation to the matter. *Commonwealth v. Kinnard*, 326 A.2d 541 (Pa. Super. 1974) citing *Commonwealth v. DeMasi*, 234 Pa. 570 (Pa. 1912). Appellant is without standing to complain if the sole basis for the complaint is that the testimony would tend to incriminate the witness. *Commonwealth v. Spallone*, 35 A.2d 727 (Pa. Super. 1944) (Appellant objected to the testimony of a witness on the ground it would tend to incriminate her however it was not contended her testimony was irrelevant or inadmissible on any other ground and, as such, had no standing to complain on appeal).

Appellant's contention that this Court erred by allowing Sijourney Yokley to re-take the witness stand and testify after she claimed her Fifth Amendment privilege is nothing more than a red-herring. First and foremost, the privilege attaches to the individual testifying and not to Appellant against whom the testimony is given and Appellant does not have standing to raise the issue. Second, while the record does not capture Ms. Yokley' s change of mind prior to re-taking the witness stand, it is obvious that she

did this voluntarily and without coercion, as demonstrated by her subsequent testimony. Third, counsel for Appellant never objected to Ms. Yokley coming back into the courtroom to testify.

Appellant's initial objection to Ms. Yokley was not based on his concern for her perjuring herself; rather, it was a veiled attempt to prevent her from testifying against him period. Appellant knew she was an eyewitness and that her statement to the police confirmed this. If the jury heard this, it would be extremely damaging and undermine his defense.

As the record reflects, while Sijourney Yokley was testifying, it was reported to this Court that her mother was signaling to her daughter, particularly when this Court was addressing the right to counsel if Ms. Yokley felt she may implicate or perjure herself. Ms. Yokley's initial response to want counsel was predicated on her mother's gesturing. After Ms. Yokley exited the courtroom into the rear hallway for a brief time, she came back in and testified in a composed and forthright manner without any objection from counsel for Appellant. [N.T., 2/10/2015 p. 322-327].

### 4) This Court Did Not Err By Permitting Allante Johnson to Testify In Regards to His Vehicle Being Vandalized Prior to Trial.

The admissibility of evidence is at the discretion of the trial court and subject to review for abuse of discretion. An abuse is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will direction is abused. *Commonwealth v. Hairston*, 84 A.3d 657, 664-65 (Pa. 2014).

Appellant argues that Allante Johnson should not have been allowed to testify that someone vandalized his car and wrote "die rat" on the back. In addition, Appellant argues this Court erred when it allowed the testimony because there was no showing that it was linked directly or indirectly to Appellant, who was incarcerated at the time of the vandalism.

Appellant's argument is without merit. Mr. Johnson was responding to the Commonwealth's question as to why he did not appear back in December of 2014, which was the reason his plea agreement was voided. Appellant answered that he did not appear because he was scared because someone

vandalized his car and wrote "die rat". The evidence was offered to show that sometime between Mr. Johnson's preliminary hearing testimony and the date he was supposed to show for trial in December that he was frightened because of a specific and particular incident. When Mr. Johnson began to talk about another incident, the Commonwealth stopped Mr. Johnson and did not proceed with that particular line of questioning. The testimony was directly related to the matter, even if Appellant was incarcerated at time.

In addition, Appellant's allegation that this Court did not give a curative instruction is without merit. When Mr. Johnson testified that people at the jail and people on the street were talking about doing things to him, counsel objected, and this Court sustained the objection. In addition, this Court ordered the response stricken from the record and counsel responded "good enough, your honor." [N.T., 2/11/2015 p. 136]. Thus, Appellant's claim is without merit.

Throughout the litigation process, Appellant sought to have this Court completely sanitize the trial by preventing witness after witness from testifying as to how street life in Chester is and how Appellant operates in that milieu. Where direct intimidation failed and witnesses stepped forward, Appellant implored this Court to disallow portions of their testimony that touched upon the stated and implied threats should they testify. Even in the courtroom, family of Appellant and those aligned with him employed dark, cold stares and body posture attempting to convey the not so subtle message that testimony harmful to appellant would be answered. Fortunately, the witnesses, though concerned and scared for their safety, set these fears aside and testified.

**CONCLUSION**

Appellant's issues are without merit and his judgment of sentence should be affirmed.

BY THE COURT:

_____
John P. Capuzzi, Sr.

2015 JUL 31 AM 9: 40

FILED